Laura HATHAWAY, d/b/a R.N. Nursing Home, Plaintiff-Appellant,

v.

David MATHEWS, Secretary, United States Department of Health, Education & Welfare, et al., Defendants-Appellees.

No. 76–1370.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 20, 1976.

Decided Dec. 21, 1976.

David F. McNamar, Indianapolis, Ind., for plaintiff-appellant.

James B. Young, U. S. Atty., John Daniel Tinder, Asst. U. S. Atty., Theodore L. Sendak, Atty. Gen., Arthur T. Perry, Deputy Atty. Gen., Indianapolis, Ind., for defendants-appellees.

Before CLARK, Associate Justice (Retired),* and SWYGERT and CUMMINGS, Circuit Judges.

SWYGERT, Circuit Judge.

In this case appellant challenges the decision of the Department of Health, Education and Welfare (HEW) to terminate Medicaid benefits allocated for patients in the nursing home that she operates because the home allegedly does not comply with federal standards. She contends that HEW may not cut off Medicaid payments without first granting her notice of the alleged violations and a hearing in which she can attempt to demonstrate that the home is in fact in compliance with federal standards. We agree, and reverse the judgment of the district court.

I

Appellant Laura Hathaway owns and operates the R.N. Nursing Home in Walkerton, Indiana. The Home has approximately 36 residents, all of whom rely on Medicaid to pay their bills. These payments are made pursuant to a provider agreement, required under the federal Social Security Act, between the Home and the State of Indiana. The Home has for some time been licensed as an intermediate health care facility by the State of Indiana. This license was renewed for a period of one year on December 17, 1975, indicating that the State found the Home to be in compliance with state and federal standards.

In December 1975, HEW, acting on complaints that the R.N. Nursing Home failed to satisfy federal regulations for intermediate care facilities, sent an inspection team to examine the premises of the Home. Further inspections were made in February 1976. On the basis of these investigations, HEW concluded that the Home was not in compliance with federal law. In accordance with established procedures, the Department on March 17, 1976 sent a letter to Wayne Stanton, the Administrator of the Indiana Department of Public Welfare, notifying him that federal Medicaid payments on behalf of the residents of the Home would cease after April 20, 1976.

On March 18, 1976, Stanton sent a letter to appellant informing her that because of the federal action, the State had no alternative but to decertify the R.N. Nursing Home as a provider of intermediate services. A copy of the letter from HEW was enclosed.

On March 26, 1976, Hathaway filed suit in the United States District Court for the Southern District of Indiana, seeking damages, injunctive relief, and a temporary restraining order. She contended that she had a property interest, cognizable under the due process clause of the fourteenth amendment, in the continuation of Medicaid payments to the Home and that the payments therefore could not be terminated without notice of the specific areas in which the Home was deficient under federal law and a hearing in which she could have an opportunity to rebut HEW's allegations. The district court, in denying the motion for a temporary restraining order and granting the defendants' motion to dismiss, relied on three factors. First, it held that because Hathaway's relationship was with the State alone, she could not seek a remedy against the federal government. Second, it found that any requirements of due process could be satisfied by a post-termination hearing. Finally, it held that Hathaway had failed to exhaust administrative remedies available under state law. Hathaway appeals from the district court's decision.

II

The correct resolution of this case depends upon an understanding of the mechanics of the Medicaid program. Under Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., Medicaid is a cooperative arrangement between the states and

* The Honorable Tom C. Clark, Associate Justice (Retired) of the Supreme Court of the United States, is sitting by designation.

the federal government. Both the states and HEW provide a portion of the funds to pay claims, with the exact percentage determined by the applicable State plan. 42 U.S.C. § 1396a(a)(2). Under the Indiana State plan, Indiana pays 47.1 percent of each claim, with the remainder paid for by the federal government.

The statute calls for the states to administer the program, and to evaluate whether a particular institution is qualified to receive payments for services which it renders to Medicaid recipients. 42 U.S.C. § 1396a(a)(33)(B). Before a state can certify an institution as qualified, it must find that that institution meets all requirements for licensure under state law, see 45 C.F.R. § 249.10(b)(15)(i)(A), as well as the criteria laid down by federal regulations. See 45 C.F.R. § 249.12. After certification, the state and the institution enter into a provider agreement that formalizes the arrangements for the provision of services by the institution and the payment of claims by the state. 45 C.F.R. § 249.10(b)(15)(i)(E). HEW pays the state for the portion of each claim for which it is responsible. The state in turns pays those funds, as well as its share of each claim, directly to the institution.[1]

HEW, however, retains the power to independently verify through its own inspection that the institution complies with federal requirements. If HEW determines that the institution is out of compliance, it can refuse to pay the federal share of Medicaid payments. 45 C.F.R. § 249.10(b)(15)(vi).

HEW therefore followed the procedure contemplated by the regulations promulgated under the Social Security Act in refusing to continue Medicaid payments on behalf of residents of the R.N. Nursing Home because it found that the Home did not comply with federal standards. Moreover, the regulations do not provide for notice or a hearing before funds are cut off. Appellant's only claim is that such a summary termination of funds is unconstitutional under the due process clause.

## III

**A.**

■ HEW argues that because it has no legal relationship with the appellant, she cannot seek any legal remedy against it with respect to the termination of funds. Under the Social Security Act and the regulations promulgated under it, HEW asserts, the federal government's only function is to pay the states on behalf of eligible recipients of Medicaid. It claims that it has obligations to the states and the individuals for whom the payments are made, but not to a provider of health care. HEW further contends that because the provider contract was solely between Hathaway and Indiana, she should seek her remedy against the State.

To accept this argument would be to exalt legal formalism over reality. Simply because HEW makes payments to the states, rather than directly to the provider, does not mean that there is not an important relationship between the provider and the federal government. We were informed at oral argument that all 36 residents of the R.N. Nursing Home depend on Medicaid to pay their bills. If HEW cuts off Medicaid payments, these residents will have to leave and Hathaway will be forced out of business. Such a result would be justified if the R.N. Nursing Home in fact is substantially out of compliance with federal regulations designed to protect the health of its residents. But to deny Hathaway the right to bring an action against the federal government simply because federal funds come to her through the conduit of the State is to deny that it is the federal government, and not the State, which threatens to cause her injury. We will not subscribe to such a palpable fiction.

■ Moreover, HEW's suggestion that Hathaway should properly seek relief against the State is totally disingenuous. As the State has pointed out, there is no

---

1. Under this scheme, therefore, the individual for whom the Medicaid payment is earmarked never directly receives it. Instead, the funds go directly to the provider of health care.

remedy within its power to grant that will relieve Hathaway's plight. By renewing the Home's license, the State has already indicated that in its opinion the Home does comply with both state and federal requirements. The State has further indicated that it is prepared to continue paying its share of Medicaid claims to the Home.[2] What the State cannot do is to compel HEW to halt its planned termination of the federal share of these payments.

### B.

■ The gravamen of appellant's case is that her expectation of continuing to receive Medicaid payments on behalf of residents of the Home, as long as the Home complies with state and federal requirements, is a protected property right under the due process clause. She argues that she cannot be deprived of such a property right without due process of law, which requires at a minimum notice and a hearing.

■ A long line of cases supports the validity of this claim, as HEW appears to concede. Title XIX of the Social Security Act created expectations on the part of both consumers and providers of health care. While Congress need not have enacted Title XIX in the first place, once it did so the federal government cannot terminate Medicaid payments without providing notice of the reasons for termination to the person who is to be deprived of the statutory entitlement and a hearing before an impartial factfinder in which that person can attempt to rebut the charges against him. *See, e.g., Goss v. Lopez,* 419 U.S. 565, 572–573, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Arnett v. Kennedy,* 416 U.S. 134, 164, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring); *Board of Regents v. Roth,* 408 U.S. 564, 576–578, 92 S.Ct. 2701, 33 L.Ed.2d

548 (1972); *Goldberg v. Kelly,* 397 U.S. 254, 261, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The Second Circuit has recently reached the identical conclusion with respect to the termination of Medicaid payments to the proprietor of a nursing home. *Case v. Weinberger,* 523 F.2d 602, 606 (2d Cir. 1975). *See also Ross v. Wisconsin Dept. of Health & Social Services,* 369 F.Supp. 570 (E.D.Wis. 1973) (three-judge court) (per curiam) (nursing home operator entitled to due process hearing before patients can be removed pursuant to Wisconsin statute governing health and safety).[3]

HEW asserts, however, that even if Hathaway must be given a hearing, she need not be given a pre-termination hearing. Given the health and safety dangers posed to the residents of the Home by its failure to comply with federal requirements, HEW contends, Medicaid payments must be immediately terminated so that the State of Indiana will be compelled to move these people to another intermediate care facility without delay. HEW urges that we affirm the district court's holding that a post-termination hearing is enough to satisfy the requirements of due process.

In determining whether a hearing must be afforded before a statutory entitlement can be removed, we must balance the interests of the Government in protecting the health and safety of the Home's residents and the integrity of the Medicaid program against Hathaway's interests in not having the flow of Medicaid payments interrupted while she waits for her hearing. *Arnett v. Kennedy,* 416 U.S. at 167–68, 94 S.Ct. 1633 (Powell, J., concurring); *Goldberg v. Kelly,* 397 U.S. at 263–66, 90 S.Ct. 1011; *Case v. Weinberger,* 523 F.2d at 606. Because all of the residents pay for their care through Medicaid, even a temporary interruption of

**2.** We note that under federal law, the only action that the State could have taken to effectively help Hathaway was to ask HEW to reconsider its decision, pursuant to 42 U.S.C. § 1316(d). The State did this on April 5, 1976.

**3.** The costs that HEW will incur in conducting hearings can be minimized by cooperative arrangements between the federal government and the states. For example, Indiana provides

for a hearing before an impartial factfinder whenever the State seeks to terminate medical assistance payments to a provider of health care. *See* Ind.Code §§ 12–1–7–15.3, –15.4. In this case, if the State agrees to permit its hearing facilities to be used, HEW could bring its charges against the R.N. Nursing Home before a State hearing examiner.

the payments would put Hathaway out of business. Moveover, to compel the residents of the Home to move to a new facility (or a number of new facilities) would create a major disruption in their lives. Where the deprivation to the individuals affected by the removal of a governmental benefit is this severe, the Government's asserted interest must be pressing to justify postponing the hearing until after termination. *See Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1970); *Goldberg v. Kelly,* 397 U.S. at 261–66, 90 S.Ct. 1011; *Ross v. Wisconsin Dept. of Health & Social Services,* 369 F.Supp. at 572.

HEW argues that the danger to the health and safety of the residents because of the Home's alleged deficiencies is so great that any delay for a hearing should not be countenanced. The record, however, does not support this argument. HEW's first inspection of the Home took place in December 1975 and was followed by another inspection in February 1976. Hathaway was not informed during or after either inspection of any violations. HEW did not notify the State of its intention to terminate payments to the Home until March 17, 1976. We cannot believe that conditions at the Home were so dangerous that a delay for a hearing must be avoided if HEW could wait three months before informing anyone of those conditions. This conclusion is buttressed by the fact that the State had recently completed its inspection of the Home and had found no dangerous conditions. While a disagreement between federal and state inspectors as to whether the Home was fully in compliance with federal regulations is understandable, it strains credulity to assume that the state inspectors could have missed violations so serious as to constitute an emergency.

HEW relies on *Case v. Weinberger,* in which the Second Circuit held that a post-termination hearing was enough to satisfy due process when HEW terminates Medicaid payments to a nursing home. *Case* is distinguishable on a number of factual grounds. There was no dispute in that case that the nursing home was in violation of the Life Safety Code of the National Fire Protection Association, contrary to Title XIX's specific command. *See* 42 U.S.C. § 1396a(a)(28)(F)(i). The appellant in *Case* did not contend that HEW's factual findings were erroneous; rather, she asserted that because some of the violations were uncorrectable HEW should have granted her a statutorily permitted waiver from strict compliance with the Life Safety Code. *See id.;* 523 F.2d at 604–07. Moreover, the state agency involved agreed with HEW's assessment of the situation, and had itself taken action against the nursing home. *See id.* at 604. Thus, in *Case* an undisputed and immediate hazard to the health and safety of the residents of the nursing home warranted summary action by HEW.

In contrast, whether the R.N. Nursing Home is in violation of federal standards is very much at issue in this case. The State of Indiana and HEW, the two governmental entities authorized under Title XIX to decide the question, are in complete disagreement as to whether the Home is in compliance. Furthermore, a Life Safety Engineer of the Indiana Department of Fire Marshal has certified that as of March 22, 1976, the Home complied with the Life Safety Code.[4] The undisputed factual pred-

4. The original letter of March 17, 1976 from HEW to the State of Indiana did not allege violations of the Life Safety Code. Clyde Downing, the Regional Commissioner of HEW's Social and Rehabilitation Service, stated in an affidavit taken subsequent to the filing of this lawsuit that HEW's inspection revealed requirements of the Life Safety Code that were not satisfied. Although the matter is not clear, at oral argument we were given the impression that the installation of a needed sprinkler system was completed after the second HEW inspection in February but before the inspection

by the Indiana Fire Marshal in late March, made at the behest of Hathaway for purposes of this action.

We note that HEW's position is not materially supported by the fact that the Home may have been out of compliance during the February inspection because the sprinklers were not yet fully installed. That HEW may not have known that on March 17 Hathaway had brought the Home into compliance only strengthens our conviction that notice and a hearing should be required before termination, except in emergency situations. If HEW and

icate which supported the Second Circuit's finding in *Case* of an emergency situation is not present here.

Another distinction between *Case* and the instant appeal is that in *Case* the nursing home operator was given direct notice of HEW's charges and permitted an informal meeting with HEW representatives, in which her counsel presented her case, before Medicaid payments were terminated. In this case HEW's letter to the State of Indiana, announcing that termination would occur in approximately a month's time, came without warning. Moreover, even if it can be assumed that the State would give Hathaway a copy of the letter, the letter gave her no notice of what specific areas of the Home were allegedly out of compliance.[5] Since the appellant in *Case* had a much greater chance of working out disputes with HEW before the ultimate sanction of termination was imposed than Hathaway did, the argument for requiring a pre-termination hearing is stronger here than it was in *Case*.

Because the decision whether a pre-termination hearing is necessary depends on the balancing of factors peculiar to this litigation, the factual distinctions between *Case* and this appeal are of critical importance. While we agree with the Second Circuit that a post-termination hearing would satisfy due process in an emergency, we do not find an emergency present in this case. We therefore hold that HEW may not terminate Medicaid payments allocated for residents of the R.N. Nursing Home until it has first given Hathaway notice of the charges against the Home and conducted a hearing in which Hathaway can challenge the validity of those charges.

The judgment of the district court is reversed and the cause is remanded for proceedings consistent with this opinion.

Hathaway had been in communication, and if Hathaway had been able to confront HEW's specific grievances, this lawsuit probably could have been avoided.

5. The letter stated that the Home "does not meet the standards for certification (45 CFR 249.33(a)(ii) and (v))." This reference was apparently a typographical error, since 45 C.F.R.

§ 249.33(a)(ii) and (v) do not exist. When Hathaway then wrote directly to HEW to ask what the alleged deficiencies were, the Department's reply, a model of bureaucratic doubletalk, still did not specify what areas of the Home were out of compliance or even which regulations were violated.