Ann KLEIN, Commissioner, New Jersey
Department of Institutions and
Agencies, et al., Plaintiffs,

v.

David MATHEWS, Secretary, Department
of Health, Education and Welfare, and
William Toby, Acting Commissioner, Re-
gion II, Social and Rehabilitative Serv-
ices, Department of Health, Education
and Welfare, Defendants.

Civ. A. No. 76–1197.

United States District Court,
D. New Jersey.

March 31, 1977.

Stanley C. Van Ness, Public Advocate of the State of New Jersey, by Arthur Penn, Director of Public Interest Advocacy, Trenton, N.J., Robert Westreich, Asst. Deputy Public Advocate, for class plaintiffs.

William F. Hyland, Atty. Gen., by Robert E. Popkin, Deputy Atty. Gen., Trenton N.J., for plaintiff Ann Klein.

Jonathan L. Goldstein, U. S. Atty., Newark, N.J., by Susan P. Engelman, Asst. U. S. Atty., Newark, N.J., for defendants.

Alfred C. Clapp, Clapp & Eisenberg, Newark, N.J., Patrick T. McGahn, Jr., McGahn & Friss, Atlantic City, N.J., for intervenor Shore Manor Nursing Home.

## OPINION

BROTMAN, District Judge.

This case involves the efforts of the State of New Jersey and four hundred fifty Medicaid patients to block the termination of federal financial participation for services provided at the Shore Manor Nursing Home under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*[1] The Commissioner of New Jersey's Department of Institutions and Agencies and three Shore Manor patients filed this class action upon the Department of Health, Education and Welfare's determination that Shore Manor is not a qualified Medicaid provider and that, therefore, New Jersey can no longer claim federal financial participation for services rendered at that facility. This court has jurisdiction under 28 U.S.C. § 1331(a), § 1361.

Shore Manor is the largest provider of skilled nursing and intermediate care services in New Jersey's Medicaid program. Its patients, who are dependent on the continued availability of Medicaid benefits, sought a hearing before HEW to contest HEW's determination that the facility is not in compliance with the federal standards for provider participation. Such request was denied and federal financial participation was terminated thirty days subsequent to this court's vacating the preliminary injunction it had issued on July 13, 1976. New Jersey has pursued its only remedy, seeking reconsideration of HEW's decision pursuant to 42 U.S.C. § 1316(d). Such reconsideration is pending.

Presently before the court, on motion for summary judgment, is the patients' claim that due process entitled them to notice and a hearing before HEW can terminate federal financial participation for a Medicaid facility deemed to be an unqualified provider.[2] The patients seek to enjoin the termination of federal funds pending a hearing where they could challenge HEW's determination that Shore Manor is not in

---

1. Hereinafter specific statutory references will be cited only to the *United States Code.*

2. Also at issue in this case is whether an HEW regulation, 45 C.F.R. § 249.10(b)(4)(i)(C), which requires the termination of federal financial participation within thirty days of the termination of a facility's provider status is inconsistent with Title XIX. On November 8, 1976 the court held a hearing at which time testimony was received concerning the impact of the forced relocation of large numbers of Medicaid patients caused by the termination of federal financial participation thirty days after the determination of non-compliance. The hearing revealed an acute shortage of Medicaid beds in New Jersey and the great difficulty, hardship and expense attendant to the involuntary relocation of hundreds of patients. The court has deferred consideration of the so-called "thirty day rule" pending disposition of the patients' due process claim.

compliance with the standards of provider participation set forth in 42 U.S.C. § 1395x(j) as incorporated by 42 U.S.C. § 1396a(a)(28) and the regulations promulgated thereunder. The court will reach the merits of the patients' claim as the relevant facts discussed herein are not in dispute. Fed.R.Civ.P. 56.

■ Before proceeding to a discussion of the merits of the patients' claim, it is essential to present the framework of the Medicaid program. Medicaid is a joint federal-state program under which benefits are provided to eligible recipients who are unable to purchase medical services in the marketplace. Under Title XIX of the Social Security Act, Congress provided for federal reimbursement of a percentage of state expenditures for the cost of medical services provided to eligible recipients by qualified providers. Primary administration of the program is left to the individual states through the state plan required by 42 U.S.C. § 1396a(a). Included in that plan is the responsibility to determine whether a provider of services is qualified under the applicable federal standards, 42 U.S.C. § 1396a(a)(33)(B). Facilities determined to be out of compliance with the applicable standards of participation are decertified by the state agency which administers the state plan, 42 U.S.C. § 1396a(a)(5), rendering such facilities ineligible to participate in the Medicaid program.

■ If in administering the plan, state action results in the suspension, reduction, discontinuance or termination of assistance, recipients have a right to a hearing prior to the effectuation of that state action, 45

C.F.R. § 205.10(a)(5), and federal financial participation is available pending such a hearing, 45 C.F.R. § 205.10(b)(1).[3] As will be discussed later, the determination that a Medicaid facility is not in compliance with the applicable federal standards and the decertification of the facility would constitute the kind of state action within the scope of 45 C.F.R. § 205.10(a)(5). However, this case presents a factual setting which deviates from that which would be expected from the statutory design. In this case HEW, rather than the state agency, determined that Shore Manor is not in compliance with the applicable federal standards, and that, therefore, federal financial participation should be terminated. Neither Title XIX nor the regulations promulgated thereunder expressly allow the patients the right to contest that decision *at any time.* The issue presented is whether the Fifth Amendment's procedural due process protections require that the patients have the right to a hearing before the termination of federal financial participation.

The impacts of HEW's decision to terminate a facility's provider status are many.[4] No longer eligible to receive federal reimbursement for the cost of the services rendered at the terminated facility, the state is compelled to transfer the patients to available beds in other qualified Medicaid providers. At best the patients are faced with involuntary transfer to another facility that has comparable services.[5] As will be detailed below such an involuntary transfer causes the patients to endure the rigors of "transfer trauma." However, if, due to a lack of available beds the patients cannot be transferred to a facility which provides the same level of care, they would suffer a

---

**3.** The exceptions to the maintenance of benefits and federal financial participation pending a hearing decision are not relevant here.

**4.** In challenging the patients' standing to contest its decision, HEW contends that the termination of federal financial participation for a facility concerns only the legal relationship between the state and HEW, and in no way affects the patients' position with respect to Medicaid benefits. The short answer to this argument is that the mere fact that HEW makes no direct payment to the patients has little to do

with whether the patients are adversely affected by the termination of federal funds. The nature of this adverse effect is detailed throughout the remainder of this opinion.

**5.** Relevant here are the services provided by both skilled nursing and intermediate care facilities. Of course, the patients could remain at the terminated facility, if it remained open. However, they would lose the benefits of participation in the Medicaid program.

loss of benefits to which they are entitled under Title XIX.[6]

Considering the massive impact termination of a facility's provider status has upon the well being of Medicaid patients and their right to receive benefits under Title XIX, it is surprising that more case law dealing with these issues has not developed. Perhaps it is a function of the nursing home patients' isolation from the services of lawyers, lay advocates, family and friends. That is not to say no law has developed,[7] but simply that there is a paucity of opinions exploring what the court considers difficult and important issues which affect the lives of many.

■ As has been previously noted, the patients claim that under the procedural due process protections of the Fifth Amendment they are entitled to a hearing prior to the termination of federal financial participation. Under the Due Process Clauses of the Fifth and Fourteenth Amendments it has been consistently recognized that government may not deprive citizens of statutorily created property interests without providing notice and some opportunity to contest the decision. *E.g., Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The threshold question here is whether the termination of federal financial participation for services rendered by a Medicaid provider works a deprivation cognizable under due process. If procedural due process protections are triggered, then a balancing of the competing interests determines what process is due. It is to this two-prong analysis that the court now turns.

Although the court received testimony concerning the acute shortage of Medicaid beds and the impossibility of placing all of Shore Manor's patients in qualified facilities providing the same level of care within the thirty day grace period allowed under 45 C.F.R. § 249.10(b)(4)(i)(C), the patients do not urge that HEW's termination of federal financial participation will cause a termination of the patients' Medicaid benefits. This position is apparently premised on the state's willingness to bear the full cost of the patients' care until space is available at other providers. However, the state has no obligation under Title XIX indefinitely to maintain Medicaid patients at a facility deemed by HEW to be ineligible to render reimbursable Medicaid services.[8] Without space available in qualified providers the patients cannot receive the benefits of participation in the Medicaid program. Therefore, although not urged by the patients, it seems that given the size of the patient population at Shore Manor and the acute nature of New Jersey's bed shortage, the termination of federal financial participation is tantamount to a denial of benefits. The deprivation of benefits under the Social Security Act has repeatedly been held to trigger procedural due process protections. *E.g., Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). However, the court need not find that the termination of federal funds works such a denial in order to conclude that due process rights are implicated.

■ The thrust of the patients' argument is that their forced relocation is a denial of a legitimate legal expectancy in continued occupancy at Shore Manor. Under the applicable regulations, a nursing home patient may be

> "transferred or discharged only for medical reasons, or for his welfare or that of other patients, or for nonpayment for his stay . . . ."

---

6. For example, a patient entitled to skilled nursing services might be transferred to an intermediate care facility.

7. *See Mabel Dunn Rest Home, Inc. v. Weinberger,* No. 75–0162 (D.R.I.1975) *reported in* 9 Cl.Rev. 200 (1975); *Kane v. Parry,* 82 Misc.2d 1019, 371 N.Y.S.2d 605 (Sup.Ct.1975) *rev'd,* 55 A.D.2d 678, 390 N.Y.S.2d 191 (1976),

rev'd, 41 N.Y.2d 1051, —— N.E.2d ——, —— N.Y.S.2d —— (1977); *Nicobatz v. Weinberger,* CCH MEDICARE AND MEDICAID GUIDE ¶ 27,427, 1975 Transfer Binder at 9827 (C.D.Cal. 1974).

8. A probable motivating factor for the state is the hope that federal funds will be re-instated after reconsideration under 42 U.S.C. § 1316(d).

20 C.F.R. § 405.1121(k)(4); 45 C.F.R. § 249.12(a)(1)(ii)(B)(4).

While the patients do not contend they have a right to remain at a facility that does not comply with the applicable federal standards they do urge that the above quoted regulations do give them a legitimate entitlement to continued occupancy in a complying facility, and therefore, a right to a hearing on the issue of compliance. This regulation does vest the patients with a property interest in their continued occupancy under *Board of Regents v. Roth, supra.* The regulation constitutes an existing rule that secures and supports the patients' claim of continued occupancy. *See Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

In addition to the regulations, the patients rely on cases which hold that occupants of public or quasi-public housing have a legitimate expectancy of continued occupancy. Even where traditional property rights have not been found, the courts have held that once the government extends benefits such as public or quasi-public housing, there is an interest in continued occupancy cognizable under the due process clause. *Caramico v. Secretary of the Dept. of HUD,* 509 F.2d 694 (2nd Cir. 1974); *Joy v. Daniels,* 479 F.2d 1236 (4th Cir. 1973); *Escalera v. New York City Housing Authority,* 425 F.2d 853 (2nd Cir. 1970). In a similar vein are a number of cases that have recognized a legitimate expectancy in continued government supply of utility services. *E.g., Koger v. Guarino,* 412 F.Supp. 1375 (E.D. Pa.1976), *aff'd mem.,* 549 F.2d 795 (3rd Cir. 1977), and cases collected therein at 1386. The court finds these cases persuasive authority for the patients' claim that Medicaid patients have a legitimate expectancy that they will continue to receive their benefits at the facility in which they were initially placed.

Therefore, either under traditional property interest analysis or the public housing and utilities cases, the patients at Shore Manor have a sufficient interest in continued occupancy at that facility to trigger procedural due process protections.

In addition to the deprivation of the patients' property interest in continued occupancy, involuntary transfer also works a reduction in benefits. The nature of this reduction is understood upon consideration of the full impact of the involuntary transfer of Medicaid nursing home patients. In a recent decision, the Seventh Circuit recognized that

> "to compel the residents of the [nursing] Home to move to a new facility (or a number of new facilities) would create a major disruption in their lives."

*Hathaway v. Mathews,* 546 F.2d 227, 231 (7th Cir. 1976).

In *Hathaway* the court found that the nursing home itself had a right, in the absence of emergency conditions, to a pre-termination hearing to challenge HEW's decision that the facility was not in compliance with federal standards and that federal financial participation be terminated.[9] Earlier judicial recognition of the phenomena known as "transfer trauma" is found in *Burchette v. Dumpson,* 387 F.Supp. 812 (E.D.N.Y.1974) where it was noted:

> "The damage which may result from such transfers is irreparable in the true sense of the word. Changes in surroundings and movement of long distances of senior citizens who are suffering from physical and psychological infirmities are likely to aggravate their condition and increase the likelihood of death." *Id.* at 819.

That this phenomena exists is conceded by HEW itself; in its Technical Assistance Memorandum AoA–TA–75–1 (February 19, 1975) it is noted:

> "There is a genuine hazard in the relocation of infirm aging persons from one facility to another. Dramatic increases in mortality far in excess of what would normally be expected have been documented." *Id.* at 2.

---

**9.** No such pre-termination right was urged by intervenor Shore Manor.

*See also* Exhibits E and F to Defendants' Motion to Vacate Preliminary Injunction; Testimony of Thomas Russo, Acting Deputy Director of the Division of Medical Assistance and Health Services in the Department of Human Services, State of New Jersey (Transcript of November 8, 1976 hearing at 93–94); Testimony of Carol Kurland, Social Work Supervisor, Social Services Unit for the Division of Medical Assistance and Health, State of New Jersey (T. 117–118). Although it is clear that involuntary transfer causes trauma of great magnitude, the court need not decide whether the increased hazard of mortality is sufficient, in and of itself, to mandate the procedural protections required when the government takes life.[10] It is sufficient to say that transfer works grievous loss. Aside from the physical danger, transfer trauma presents serious psychological danger. Each of the named plaintiffs has submitted an affidavit explaining the loss anticipated from transfer.

Margaret Heeschen, a 77 year old Medicaid patient, has been at Shore Manor since 1967. She considers Shore Manor to be her home, and is fearful and apprehensive at the prospect of being forced to leave.

Thomas Grant, a 73 year old Medicaid patient, has been at Shore Manor since 1972. He enjoys Shore Manor, the boardwalk at Atlantic City appurtenant to the nursing home, the proximity of his friends in the area—all of which would be lost if he was transferred.

Maurice Mizell, a 63 year old Medicaid patient, has been at Shore Manor since 1974. Shore Manor is particularly well located for him because he has been a resident of the Atlantic City area for fifty-five years.

Title XIX recognizes the Medicaid recipients' general right to choose among qualified providers. 42 U.S.C. § 1396a(a)(23); 45 C.F.R. § 249.20. Once that choice is exercised, to cause the recipient to suffer the grievous loss attendant to transfer is to reduce the benefits to which the recipient would otherwise be entitled. The involuntary transfer of Medicaid patients is simply not a cost free decision. While it may be argued that a mere change in the form of delivery of governmental benefits may not work a reduction, e.g., payment of benefits by check or by cash, it would be a callous disregard of the real life consequences to say that a Medicaid patient who suffers transfer trauma is receiving the same benefits under Title XIX as a patient not forced to similarly suffer. While cash and checks may be functional equivalents, the benefits available to involuntarily transferred patients and those not transferred are not. The trauma associated with transfer and the losses suffered as a result of transfer are tantamount to a reduction of benefits. Such reduction triggers procedural due process protections. *See Frost v. Weinberger,* 515 F.2d 57 (2nd Cir. 1975), *cert. denied,,* 424 U.S. 958, 96 S.Ct. 1435, 47 L.Ed.2d 364 (1976); *Cardinale v. Mathews,* 399 F.Supp. 1163 (D.D.C.1975); *Lyons v. Weinberger,* 376 F.Supp. 248 (S.D.N.Y.1974).

Therefore, the court concludes that HEW's determination that Shore Manor is not in compliance with the applicable federal standards and that federal financial participation be terminated results in deprivations cognizable under the Due Process Clause of the Fifth Amendment.

The only question remaining is what process is due. The patients seek a hearing to contest HEW's finding of their facility's non-compliance with federal standards. HEW has rather persistently argued that the patients cannot benefit from such a hearing because its actions were taken with only the patients' best interest in mind.[11]

---

10. However, the court feels compelled to note that by saving the patients from what it deems to be unsafe conditions, HEW's cure may be worse than the ailment for which it is administered.

11. HEW has argued that the decision to terminate federal financial participation for what

HEW has determined to be non-compliance is "in the best interest of the patients at Shore Manor," and that "relocation is preferable to inadequate health care." Affidavit of Alan Saperstein, Director of Long Term Care Standards Enforcement, Region II Department of

While the court is deferential to the expertise of HEW, it is rank paternalism to suggest that patients who live in a facility, who have firsthand knowledge of the conditions, who are best equipped to describe how that facility has served them, cannot contribute to the process by which it is determined whether the facility meets federal standards. The court finds it hard to understand how HEW can seriously argue that the very patients whom HEW seeks to protect can have no purposeful role with respect to the condition of their environment. Considering the grievous loss termination of federal financial participation causes, and the patients' firsthand knowledge of the facts concerning the care provided, the court believes the patients' role in determining the facility's compliance is crucial.

■ There can be little doubt that only a pre-termination evidentiary hearing satisfies the dictates of due process. In *Goldberg v. Kelly, supra,* the Court identified four life sustaining commodities which the welfare recipient in that case would have been denied if welfare benefits were terminated; one of the four was medical care. As was detailed earlier, transfer from Shore Manor involves a deprivation sufficiently severe to be considered "grievous loss" within *Goldberg's* coverage. The deprivation suffered is not compensable or reversible, or capable of amelioration by the availability of other social services. *Compare Mathews v. Eldridge, supra, with Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

In deciding that a nursing home was entitled to a pre-termination hearing in other than emergency circumstances where HEW had determined that the nursing home was not in compliance with federal standards, the court in *Hathaway* was particularly sensitive to the disruption transfer would cause the patients.

"Where *the deprivation to the individuals* affected by the removal of a governmental benefit *is this severe, the Government's asserted interest must be pressing to justify postponing the hearing until after termination." Hathaway v. Mathews, supra,* 546 F.2d at 231. (citations omitted, emphasis added).

In *Hathaway* the court determined that the government's interest was insufficiently pressing where the patients were not threatened with conditions dangerous enough to be characterized as an emergency. As in *Hathaway* the patients at Shore Manor are not threatened with dangerous conditions constituting an emergency. In the case at hand HEW terminated federal financial participation long after it made its initial determination that the facility was not in compliance.[12] Indeed, at the time of termination, New Jersey's Department of Health and other surveyors disagreed with HEW's finding of non-compliance.[13] These circumstances hardly support a finding that the conditions at Shore Manor were sufficiently dangerous to constitute an emergency; and the court does not understand HEW to so urge. Therefore, in this respect the situation in this case is much like *Hathaway.*

However, there is an important distinguishing factor between this case and

HEW ¶ 14; Supplemental Affidavit ¶ 19. Obviously the patients do not believe that HEW has accurately identified where their best interest lies.

**12.** HEW's initial termination of federal financial participation was made in June 1976, one year after its initial determination that Shore Manor was not in compliance with the applicable federal standards. However, in the interim there was an *improvement* in conditions at Shore Manor. For example, a state supervisor was appointed to oversee the facility's efforts to comply with federal standards. Yet in the interim the critical Medicaid bed shortage in New Jersey continued. It was this shortage of beds to which Shore Manor patients could be transferred that prompted HEW not to terminate federal financial participation upon its initial finding of non-compliance. Supplemental Affidavit of Alan J. Saperstein ¶ 16.

**13.** *See* Affidavits of Viola Mack, Supervisor of Inspections of Long Term Health Care Facilities for the New Jersey Department of Health; Ira J. Harrison, D.D.S., Dental Consultant to the Division of Medical Assistance and Health Care Services, State of New Jersey; Frank G. Cuomo, Deputy State Fire Marshall, State of New Jersey.

*Hathaway* that adds significant weight to the patients' argument that the hearing should not be postponed until after termination. In *Hathaway* the nursing home was asserting its financial interest in its continued status as a Medicaid provider; an interest that may or may not be consistent with the patients' interests. However, here the patients themselves challenge HEW's termination of the facility's status as a Medicaid provider. The patients' direct assertion of their interest in this case not only undermines the government's interest in a pre-hearing termination but is a more compelling interest in postponing termination than that asserted by the nursing home in *Hathaway*. While the court is mindful of the great dangers posed by inadequate health care facilities, where in a non-emergency situation hundreds of patients are faced with the grievous loss occasioned by involuntary transfer, the balance tips decidedly in favor of a pre-termination hearing.[14]

In determining the form of the pre-termination hearing the court turns to existing HEW regulations. HEW, in promulgating 45 C.F.R. § 205.10, has provided a mechanism by which aggrieved Medicaid recipients can contest state action which results in the "suspension, reduction, discontinuance or termination of assistance." However, HEW, rather than the state, is the relevant decisionmaker in the case *sub judice*; therefore a state level evidentiary hearing pursuant to § 205.10 would serve no purpose.[15] While the state level hearing is inapplicable here, the substance of the hearing procedure adopted by HEW is appropriately transferrable. The court finds that the hearing procedure formulated in 45 C.F.R. § 205.10 is sufficient to meet the requirements of due process in this case.[16] The court will not impose hearing requirements different than those already determined by HEW to provide a proper and efficient mechanism for the patients to contest decisions affecting Title XIX benefits. Indeed, given Title XIX's vesting of standards enforcement with both HEW and the state agencies, it would be inappropriate to provide Medicaid patients with different hearing rights depending on which government agency made the finding that the patients' facility did not meet the applicable federal standards.

For all the foregoing reasons patients' motion for summary judgment is granted. The appropriate order will be entered.

14. HEW has urged that *Nicobatz v. Weinberger,* CCH MEDICARE AND MEDICAID GUIDE ¶ 27,427, 1975 Transfer Binder at 9827 (C.D. Cal.1974) controls here. In *Nicobatz,* HEW and the State of California refused to enter into new provider agreements with a nursing home whose Medicaid and Medicare time limited contracts of participation were to expire. The court held, in denying plaintiff's motion for a preliminary injunction, that neither the nursing home nor the patients had a right to a hearing prior to the lapsing of the provider contracts. *Nicobatz* did not deal with the termination of a provider's existing status, the impact of transfer trauma, transfer as a reduction of benefits, or the difficulty of relocation where there is a shortage of available beds in facilities providing comparable levels of care. In those respects *Nicobatz* is distinguishable. In any event its brief discussion of the patients pre-termination rights is less than persuasive. To the extent it is applicable to the case at hand it is wholly undermined by *Hathaway*'s reasoning and, in any event, this court declines to follow it.

15. Had the state terminated Shore Manor's status as a Medicaid provider a pre-termination hearing pursuant to 45 C.F.R. § 205.10 would have been required.

16. Indeed a consolidation of the § 205.10 individual hearings would not only be sufficient but more efficacious for the class.