616 F.2d 407
 David BREDE, Frank Duarte, Mary Duarte, Paul Harada,
Clarence Naia, Leon Nono, Francis Palea, Jubilee Pudhala,
Bernard Punikaia, Bernice Pupule, Richard Pupule, Antonion
Sagadraca and Shivuku Sagadraca, Plaintiffs-Appellants,
v.
DIRECTOR FOR the DEPARTMENT OF HEALTH FOR the STATE OF
HAWAII, and John Does 1-30, Individually and in
their capacity as agents of the
Department of Health, State of
Hawaii, Defendants-Appellees.
 No. 78-3152.
 United States Court of Appeals,
Ninth Circuit.
 March 3, 1980.
Rehearing Denied April 21, 1980.
 
 John F. Schweigert, Schweigert & Kent, Honolulu, Hawaii, Sidney M. Wolinsky, San Francisco, Cal., for plaintiffs-appellants.
 Michael Lilly, Deputy Atty. Gen., Honolulu, Hawaii, for defendants-appellees.
 Appeal from the United States District Court for the District of Hawaii.
 Before TRASK and FERGUSON, Circuit Judges, and SOLOMON,* District judge.
 TRASK, Circuit Judge:
 
 
 1
 For many years, the State of Hawaii has maintained a leprosarium on the Kalaupapa peninsula on the island of Molokai. Beginning in the late 1940's, Hawaii has also maintained a residential facility of just over 11 acres at Hale Mohalu near Pearl City, Oahu. This facility was established in order to enable those leprosy patients who were in need of more sophisticated medical care than was available at Kalaupapa, to live near Honolulu hospitals where expensive equipment and better medical care was available.[1] The Hale Mohalu facility was originally established on federal land. The United States, in return for a commitment by the State of Hawaii to provide care for the state's leoprosy sufferers, conveyed the land to the state, subject to a twenty-one-year maintenance condition.[2] Hawaii nevertheless failed to maintain the facility over the years, permitting it to deteriorate to some extent. The federal government, however, did not utilize its right to require maintenance. On March 23, 1977, the United States' right of entry expired and Hawaii's title to Hale Mohalu became a fee simple absolute. Shortly thereafter, the state began proceedings to close the facility and move its residential and medical support services to Leahi Hospital in Honolulu.
 
 
 2
 A number of the facility's residents, in appreciation of the residential nature of Hale Mohalu with its private or semi-private living quarters and easy access to friends and family, chose to remain. Over the last decade, advances in medical science have enabled physicians to treat leprosy patients through outpatient services. As a result, the inpatient residents remaining at Hale Mohalu were among the more elderly, afflicted, and crippled of the leprosy population.
 
 
 3
 On January 26, 1978, the Hale Mohalu facility was officially closed. In recognition of the continued residence of those patients who had decided to remain, the state provided water, electric power, telephone service, food, medical care, and supplies until September 1, 1978, when all these services were terminated. On September 5, a number of those patients still at Hale Mohalu filed the instant suit and a temporary restraining order was entered compelling the state to restore all services. On September 21, 1978, a federal district court denied appellant's motion for a preliminary injunction and dismissed their complaint for lack of standing and for failure to state a claim upon which relief may be granted.
 
 
 4
 On appeal, appellants raise a number of issues, most of which are without substantial merit. Appellants, however, do raise the possibility that they have a property interest in the form of a legitimate entitlement to continued medical care and residence facilities at the Hale Mohalu leprosarium, which interest may not be deprived without due process. We find the record inadequate to determine whether such an entitlement exists. If it does, certain due process protections, such as a pre-termination hearing, may be required. Consequently, we remand for further proceedings.
 
 
 5
 * Appellants claim an interest in receiving medical care at the Hale Mohalu facility. This interest may be a property interest protected by the due process clause of the Fifth Amendment if it is more than a "unilateral expectation." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). "(T)here must exist rules or understandings which allow the claimant's expectations to be characterized as 'a legitimate claim of entitlement' to (the benefit)." Stretten v. Wadsworth Veterans Hospital, 537 F.2d 361, 366 (9th Cir. 1976) (quoting Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). "The source of legitimate claims of entitlement is not the Constitution but rather the acts of the sovereign, state or federal, manifested in legislation, rules, or customs." Moore v. Johnson, 582 F.2d 1228, 1233 (9th Cir. 1978). See also Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).
 
 
 6
 Appellants' claim is narrow they assert an entitlement to continued operation of the Hale Mohalu leprosarium. There are two possible sources for this claim. First, appellants contend that the Hale Mohalu facility qualifies as a Medicaid "intermediate care facility" within the meaning of 42 C.F.R. § 449.10(b)(15) (1977).[3] If the appellants are correct in their assertion, then, under the patient transfer regulations for such facilities, a patient may not be transferred except for "medical reasons or for his welfare or that of other patients, or for nonpayment of his stay."[4] Administrators of intermediate care facilities do not, therefore, have the power to arbitrarily transfer patients for any reason. Under these regulations, patients at such facilities would have a "legitimate entitlement to continued residency at the (facility) of (their) choice." Klein v. Califano, 586 F.2d 250, 258 (3d Cir. 1978).
 
 
 7
 From the record as it now stands, it is impossible to determine whether Hale Mohalu is, in fact, an intermediate care facility which is subject to the Medicaid regulations. If it is an intermediate care facility, however, the appellants are entitled to a fact-finding hearing as to the cause of their transfer. See Klein v. Califano, supra, at 258-59.
 
 II
 
 8
 An alternative basis for appellant's claim to an entitlement may derive from Hawaii state law and from the hardship which a transfer may impose on Hale Mohalu patients. The state has statutorily conferred upon leprosy patients an entitlement to treatment at some state leprosarium.[5] Another state statute, however, grants the Hawaii Health Department the unrestricted power to prescribe the place of treatment.[6] Taken together, these statutes appear to authorize patient transfers "at will" and therefore the Hale Mohalu residents would enjoy no more than a "unilateral expectation" to continued services at that facility. However, while appellants may have no entitlement to services at Hale Mohalu under Hawaii statutory law, appellant's entitlement to treatment at some facility requires a measure of due process protection which may not have been provided in this case.
 
 
 9
 Under the two-part test of Board of Regents v. Roth, supra, and Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), once an entitlement to threatened services or benefits is established, it then becomes necessary to determine what process is due. The cases have recognized that when the deprivation of some government benefit would operate so as to impose severe hardship upon individuals with an entitlement to that benefit, due process protection in the form of a pretermination hearing may be required. See Goldberg v. Kelly, supra at 260-62, 90 S.Ct. at 1016-17. Here, there is no doubt that the appellants are entitled to care provided by the state. The state may not act so as to reduce these services to the point of imperiling life or imposing other severe hardship without affording the recipients a pretermination hearing. See Mathews v. Eldridge, 424 U.S. 319, 340, 96 S.Ct. 893, 905, 47 L.Ed.2d 18 (1976); Goldberg v. Kelly, supra, 397 U.S. 1016-18 at 260-63; Curlott v. Campbell, 598 F.2d 1175, 1181 (9th Cir. 1979).
 
 
 10
 In the present case, transferring the Hale Mohalu patients to Leahi Hospital may work such a reduction in benefits. There has been considerable judicial and scientific recognition of the phenomenon known as "transfer trauma." See Bracco v. Lackner, 462 F.Supp. 436, 444-45 (N.D.Cal.1978); Klein v. Mathews, 430 F.Supp. 1005, 1009-10 (D.N.J.1977); Burchette v. Dumpson, 387 F.Supp. 812, 819 (E.D.N.Y.1974). Transfer trauma is characterized by physical and emotional deterioration as well as by increased rates of mortality. "The basic principle of the phenomenon is the recognition that the transfer of geriatric patients to any unfamiliar surroundings produces an increased rate of morbidity and mortality." Bracco v. Lackner, supra at 445. The degree to which this phenomenon is applicable to the leprosy patients presently resisting transfer from Hale Mohalu to Leahi Hospital is unclear on this record. To the extent, however, that transfer trauma is a possible result of the state's decision to relocate the Hale Mohalu patients, relocation may constitute a deprivation cognizable under the due process clause. See Klein v. Mathews, supra at 1010. Cf. Moore v. Johnson, 582 F.2d 1228, 1234 (9th Cir. 1978) (no pretermination hearing required when complaint failed to allege "inhumane and harsh" means of relocating Veterans Administration Hospital patients).
 
 III
 
 11
 Upon establishing their right to due process protection, appellants become entitled to a hearing. It has been suggested, however, that any requirement for a hearing has already been satisfied. The State Health Planning and Development Agency apparently held a hearing before Hale Mohalu was officially closed. The record is too sketchy, however, for this court to determine the extent to which the appellants were represented, adequacy of the notice given, or the adequacy of the hearing itself. It is therefore necessary to remand this case to the district court. On remand, the court should hold hearings designed to ascertain whether the plaintiffs have an entitlement to services at Hale Mohalu arising from either the Medicaid regulations or from the possibility that transfer of Hale Mohalu services to Leahi Hospital could impose a severe hardship on the plaintiffs. If such an entitlement exists, then the adequacy of the hearing already held must be ascertained, and any hearings necessary to afford appellants due process should be held. The case is remanded for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 Leprosy, which is also known as Hansen's disease, is a mildly infectious degenerative disease caused by the micro-organism Mycobacterium leprae. The disease produces lesions in the skin, the mucous membranes, and the peripheral nervous system. In its more advanced stages, it affects internal organs and renders its sufferers vulnerable to other diseases such as diabetes and cancer. See Dorland's Illustrated Medical Dictionary 849 (25th ed. 1974). Leprosy is endemic to subtropical climates such as that of Hawaii. In 1952, there were more cases of leprosy in Hawaii than there were in the remainder of the United States. See S.Rep. No. 1335, 82d Cong. 2d Sess. reprinted in (1952) U.S.Code Cong. & Admin.News, pp. 1630, 1631. (Hereinafter Senate Report)
 
 
 [2]
 The United States conveyed the land in fee simple subject to a condition subsequent. The conveyance was by quitclaim deed, which incorporated by reference an Application for Purchase with Discount submitted by Hawaii which application stated:
 This real property will be used by the Territory of Hawaii on a permanent basis for a Hansen's disease hospital facility.
 The Quitclaim deed provides in pertinent part:
 
 
 [1]
 That for a period of twenty (20) years from the date of this deed the above described property herein conveyed shall be utilized continuously for public health purposes in accordance with the proposed program and plan as set forth in the application of the said GRANTEE dated June 24, 1955, and for no other purpose
 
 
 [3]
 That one year from the date of this deed and annually thereafter for the aforesaid period of twenty (20) years, unless the Secretary (of Health, Education and Welfare), or his successor in function, otherwise directs, the GRANTEE will file with the Department (of H.E.W.), or its successor in function, reports on the operation and maintenance of the above described property and will furnish, as requested, such other pertinent data evidencing continuous use of the property for the purpose specified in the above identified application
 In the event of a breach of any of the conditions set forth above . . . all right, title and interest in and to the above described property shall, at its option, revert to and become property of the UNITED STATES OF AMERICA, which in addition to all other remedies for such breach, shall have an immediate right of entry thereon, and the said GRANTEE, its successors, or assigns, shall forfeit its right, title, and interest in and to the above described property . . . PROVIDED FURTHER, that in the event the UNITED STATES OF AMERICA fails to exercise its option to re-enter the premises for any such breach of said conditions within twenty-one (21) years from the date of the conveyance, the conditions set forth above together with all right of the UNITED STATES OF AMERICA to re-enter as in this paragraph provided, shall, as of that date, terminate and be extinguished.
 The GRANTEE shall at its own sole cost and expense keep and maintain the improvements, including all buildings, structures and equipment, at any time situated upon said property, in good order, condition and repair, free from any waste . . . . Should the GRANTEE, its successors or assigns, fail to repair or replace any improvements which need repair or which have been lost, damaged or destroyed as aforesaid within ninety (90) days after written notice to do so, given to the GRANTEE by the Secretary, or his successor in function, the GRANTOR shall be authorized as agent of the GRANTEE, its successors and assigns, to enter upon the premises and to cause such repairs or replacements to be made on the behalf and at the expense of the GRANTEE.
 The quoted portions of the deed evidence not only the obligation of the State of Hawaii to maintain the Hale Mohalu site, but further evidences the requirement that the facility be used to provide Hawaii's Hansen's disease patients with a medical care facility. Hawaii's obligation to provide leprosy sufferers with care and treatment was also codified. See Haw.Rev.Stat. § 326-1, note 5, infra.
 
 
 [3]
 The 1977 regulations were those in effect at the time Hale Mohalu was officially closed and are therefore controlling
 
 
 [4]
 42 C.F.R. § 449.12(a)(1)(ii)(B)(4 ). The pertinent portions of this regulation state:
 (a) The standards for an intermediate care facility (as defined in § 449.10(b) (15) of this part) which are specified by the Secretary pursuant to section 1905(c) and (d) of the Social Security Act and are applicable to all intermediate care facilities are as follows. The facility:
 (1) Maintains methods of administrative management which assure that:
 (ii) There are written policies and procedures available to staff, residents, their families or legal representatives and the public which:
 (B) Ensure that each resident admitted to the facility:
 (4 ) Is transferred or discharged only for medical reasons or for his welfare or that of other patients, or nonpayment of his stay (except as prohibited by the title XIX program).
 
 
 [5]
 Haw.Rev.Stat. § 326-1 provides:
 Establishment of hospitals, etc.; treatment and care of persons affected with leprosy. The department of health, subject to the approval of the governor, shall establish hospitals, settlements and places as it deems necessary for the care and treatment of persons affected with leprosy.
 At every such hospital, settlement, and place there shall be exercised every reasonable effort to effect a cure of such persons, and all such persons shall be cared for as well as circumstances will permit, and given such liberties as may be deemed compatible with public safety and in the light of advances in medical science and in accordance with accepted practices elsewhere. Every patient shall be encouraged to take complete treatment so that prompt recovery can be attained and shall be discharged as soon as possible. The treatment shall be compulsory only in those cases where in the opinion of the department, such treatment is necessary to save life or prevent obvious physical suffering, and the department may take such measures as may be necessary to enforce this section.
 
 
 [6]
 Haw.Rev.Stat. § 326-3 provides in pertinent part:
 Care in other hospitals, homes, etc. Notwithstanding any of the provisions of this chapter or of any other chapter relating to this subject matter, the department of health may make arrangements for the care and treatment of any person within the jurisdiction at any hospital, nursing home or convalescent home in the State, either public or private, and bear all expenses of the hospitalization and treatment and any other necessary expenses in the same manner as though the person were confined at any hospital, settlement or place for the care and treatment of persons affected with leprosy established under section 326-1.