688 F.2d 1072
 AMERICANA HEALTHCARE CORPORATION, et al., Plaintiffs-Appellees,
v.
Richard SCHWEIKER, Secretary of Health and Human Services,
Defendant-Appellant.
TURTLE CREEK CONVALESCENT CENTERS, INC. d/b/a Northside
Healthcare Center, Plaintiff-Appellee,
v.
Richard SCHWEIKER, Secretary of Health and Human Services,
Defendant-Appellant.
CARE INNS, INC., d/b/a Clarksville Healthcare Center,
Plaintiff-Appellee,
v.
Robert F. SMITH, Acting Administrator, Donald L. Blinzinger,
Administrator of Indiana State Dept. of Public
Welfare, and The Indiana Dept. of Public
Welfare, Defendants-Appellants.
CARE INNS, INC., d/b/a Clarksville Healthcare Center,
Plaintiff-Appellee,
v.
Richard SCHWEIKER, Secretary of the Department of Health and
Human Services, Defendant-Appellant.
Laura HATHAWAY, d/b/a R. N. Nursing Home, and Judy
Carrothers, Plaintiffs-Appellees,
v.
Richard SCHWEIKER, Secretary of Health and Human Services,
Defendant-Appellant.
 Nos. 81-1522, 81-2482, 81-2755, 81-2873 and 81-1507.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 3, 1982.
Decided Aug. 18, 1982.*
Rehearing and Rehearing In Banc Denied Oct. 8, 1982.
 
 Thomas W. Crawley, Chicago, Ill., Gary L. Shaw, Deputy Atty. Gen., Indianapolis, Ind., for defendants-appellants.
 David F. McNamar, Indianapolis, Ind., for plaintiffs-appellees.
 Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and TEMPLAR, Senior District Judge.**
 COFFEY, Circuit Judge.
 
 
 1
 Consolidated in this case are appeals from four separate orders of the United States District Court for the Southern District of Indiana, Indianapolis Division.[1] Each of the orders appealed from granted the plaintiffs' request for injunctive relief prohibiting the defendants from terminating the plaintiffs' participation in the Medicare program and/or from terminating the payment of matching funds from Medicaid services without affording plaintiff an opportunity for a pre-termination hearing. We reverse.
 
 
 2
 The circumstances leading to the grant of injunctive relief in each case appealed from are set out below.
 
 1. AMERICANA-ELKHART
 
 3
 Prior to October, 1980 Americana Healthcare Center of Elkhart ("Americana-Elkhart") located in Elkhart, Indiana had been certified to participate in the Medicare program as a skilled nursing facility and had entered into a provider agreement with the U. S. Department of Health and Human Services (Department) for the provision of skilled nursing services to eligible patients.
 
 
 4
 The statutory requirements for participation in the federally funded Medicare program are set forth in Title 18 of the Social Security Act, 42 U.S.C. § 1395 (1976 and Supp. IV, 1980). The U. S. Department of Health and Human Services administers this program which provides health insurance benefits for aged and disabled persons by making payments directly to the institution or individual providing the health service or care. 42 U.S.C. § 1395cc(f) (1976 and Supp. III, 1980). In order to receive payment for services rendered to a Medicare patient, an institution must meet the conditions of participation prescribed by the Social Security Act and accompanying regulations. See 42 U.S.C. § 1395 (1976 and Supp. III, 1980) and 42 C.F.R. § 405.1011 et seq. (1981).[2] If an institution meets the conditions of participation it then becomes eligible to execute and enter into a one-year renewal provider agreement with the United States Government. 42 U.S.C. § 1395cc (1976 and Supp. III, 1979). Institutions certified as Medicare providers are subject to periodic surveys by state agencies designated by the Secretary to evaluate compliance with federal standards.[3] 42 U.S.C. § 1395aa (1976 and Supp. IV, 1980) and 42 C.F.R. § 405.1904 (1981). If the institution fails to maintain compliance with the prescribed conditions of participation, a report of the survey is sent to the Secretary of the U. S. Department of Health and Human Services and the Secretary then has the authority to terminate the institution's provider agreement at any time or decline to renew the provider agreement at the close of the one-year period. 42 U.S.C. § 1395cc(b)(2) (1976 and Supp. III, 1979) and 42 C.F.R. § 489.53(a)(3) (1980).
 
 
 5
 A letter dated October 22, 1980 from the U. S. Department of Health and Human Services notified Americana-Elkhart that an onsite survey conducted by the Indiana State Board of Health in August of 1980 demonstrated that Americana-Elkhart had deficiencies which "seriously limit your (their) capabilities to render adequate care and insure the health and safety of your (their) patients" and that the Department would not renew Americana-Elkhart's provider agreement with the Department which expired on December 1, 1980.[4] The Department's letter informed Americana-Elkhart that it could request that the Department through its subdivision, the Health Care Financing Administration, to reconsider its decision within 60 days of the notice.[5] The letter also requested that the Department be advised within 10 days of the notice if the listed deficiencies had been corrected.
 
 
 6
 Americana-Elkhart requested a reconsideration and an evidentiary pre-termination hearing of the Department's decision, asserting that it had corrected most of the deficiencies and asking that publication of notice of nonrenewal be deferred pending reconsideration. The Department denied the request for an evidentiary pre-termination hearing but pursuant to Americana-Elkhart's request for reconsideration, a resurvey of the facility was conducted. On the basis of the resurvey results showing that the facility was still not in compliance with all Medicare conditions of participation, the Department reaffirmed its decision to deny renewal of Americana-Elkhart's provider agreement. After the resurvey the Department informed Americana-Elkhart of its decision and included with its letter a list of the facility's continuing deficiencies. In addition, the letter stated that the effective date of the nonrenewal would be extended until January 31, 1981 to allow adequate time for public notice to residents or their families to allow them to find alternative facilities in which they could receive care. Finally, the letter informed the facility of its right to request within 60 days an administrative hearing before an Administrative Law Judge.
 
 
 7
 42 C.F.R. § 442.20(b) (1981) requires that a state Medicaid agency must terminate or refuse to renew a Medicaid agreement it has with a facility once the U. S. Department of Health and Human Services decides to terminate or refuse to renew a Medicare agreement with a skilled nursing facility.[6] Thus as a result of the U. S. Government's determination that Americana-Elkhart was not eligible for continued participation in the Medicare program the Indiana Department of Public Welfare decertified the nursing home from participation in the Indiana Medicaid program.
 
 
 8
 On January 27, 1981 the plaintiffs brought this action in the federal district court alleging that the administrative procedures allowing only for a post-termination hearing violated the Due Process Clause of the United States Constitution and the federal statutes. In addition, the complaint alleged that the U. S. Department of Health and Human Services' refusal to grant a pre-termination hearing made it an appealable final order of an administrative agency under 42 U.S.C. § 405(g) (Supp. IV, 1980).
 
 
 9
 Following a hearing the district court granted a preliminary injunction prohibiting the U. S. Department of Health and Human Services and the Indiana Department of Public Welfare from terminating the plaintiff's participation in the Medicare and/or Medicaid program without a pre-termination hearing.[7]
 
 2. AMERICANA-MIDTOWN
 
 10
 Americana Health Care Center of Indianapolis-Midtown (Americana-Midtown) was another certified skilled nursing facility participating in the Medicare program prior to October, 1980. By letter dated October 24, 1980 the U. S. Department of Health and Human Services notified Americana-Midtown that based upon the results of an onsite survey conducted from August 25 to 29, 1980 it had been determined that Americana-Midtown had deficiencies that "seriously limits your (their) capability to render adequate care and insure the health and safety of your (their) patients" and thus the Department would not renew its provider agreement with Americana-Midtown which was scheduled to end December 1, 1980. Attached to the letter was a four-page statement of deficiencies which formed the basis for the nonrenewal.[8]
 
 
 11
 The U. S. Department of Health and Human Services letter also informed the facility of its right to request that the Department reconsider its decision. Americana-Midtown requested reconsideration contending that it had corrected the majority of the alleged deficiencies. The Indiana State Board of Health as agent of the U. S. Department of Health and Human Services conducted a resurvey of the facility and based upon the results of that resurvey reaffirmed its original decision not to renew Americana-Midtown's provider agreement but extended the effective date of the nonrenewal to January 31, 1981 to allow adequate time for public notice to allow the transfer of patients to an eligible and certified facility. The Department informed the facility of its decision by letter detailing the deficiencies of the nursing home and informing the plaintiff of its right to request a hearing within 60 days. In addition to the request for a resurvey, the plaintiff also requested that the defendant conduct a pre-termination evidentiary hearing which request was subsequently denied by the U. S. Department of Health and Human Services.
 
 
 12
 In accordance with the provisions of 42 C.F.R. § 442.20(b) the Indiana Department of Public Welfare also decertified Americana-Midtown as a Medicaid provider based upon the Department of Health and Human Services nonrenewal decision and the facility's deficiencies.
 
 
 13
 On January 27, 1981 this action was filed in the district court seeking to enjoin the Department of Health and Human Services and the Indiana Department of Public Welfare from enforcing the nonrenewal decision against both Americana-Midtown and Americana-Elkhart.[9] The district court granted the preliminary injunction, holding that the plaintiffs had shown that they would suffer irreparable harm if injunctive relief was not ordered pending resolution of the question of the plaintiffs' entitlement to a pre-termination hearing.[10]3. TURTLE CREEK CONVALESCENT CENTERS, INC.
 
 
 14
 On November 3 through 7, 1980 an annual survey was conducted by the Indiana State Board of Health of the Turtle Creek Convalescent Centers' nursing home facility known as the Northside Healthcare Center. The Department of Health and Human Services concluded, based upon the survey done at its request, that the survey results demonstrated that the nursing home had deficiencies that "seriously limit your (their) capability to render adequate care and insure the health and safety of your (their) patients." Based upon the deficiencies revealed during the survey the Department decided not to renew the plaintiff's provider agreement which was scheduled to end March 1, 1981. The Department informed the plaintiffs of its decision by means of a letter dated January 22, 1981. The letter listed the deficiencies found during the survey and informed the facility of its right to request reconsideration of the nonrenewal decision.[11]
 
 
 15
 Turtle Creek requested reconsideration of the decision not to renew the provider agreement. Pursuant to the request for reconsideration the Department attempted to conduct a resurvey of the facility on February 9, 1981. The resurvey, however, was not completed when Turtle Creek's administrator objected and requested that the survey be discontinued after he was informed that the resurvey results would be based upon records of patient care kept before the date of the first survey as well those kept thereafter. Despite the fact that the reconsideration survey was not completed, the inspectors determined that the facility was still not in compliance with the conditions for continued participation in the Medicare program.
 
 
 16
 Turtle Creek, like the other plaintiffs in this case, requested that the U. S. Department of Health and Human Services conduct an evidentiary pre-termination hearing which request was denied by the Department.
 
 
 17
 Pursuant to the mandatory requirements of 42 C.F.R. § 442.20(b) the Indiana Department of Public Welfare decertified Turtle Creek as a provider under the Indiana Medicaid program, upon receiving notice of the U. S. Department of Health and Human Service's decision not to renew Turtle Creek's provider agreement.
 
 
 18
 Prior to the effective date of the nonrenewal decision, Turtle Creek brought this lawsuit alleging that the failure of the state and federal agencies to afford Turtle Creek a hearing prior to termination from both the Medicare and Medicaid programs violated Turtle Creek's constitutional right to due process as well as federal and state statutes. Turtle Creek sought injunctive relief prohibiting the termination of Turtle Creek's participation in the Medicare and Medicaid programs without a pre-termination hearing.
 
 
 19
 The court granted a temporary restraining order on the date the complaint was filed and scheduled a bench trial to commence shortly thereafter. At the conclusion of trial the court entered a permanent injunction prohibiting the defendants from decertifying Turtle Creek's facility relating to any decertification proceeding initiated prior to the date of the injunction and further enjoining the defendants from decertifying the Turtle Creek nursing home in any subsequent proceeding until such time as the defendants accord Turtle Creek a pre-termination evidentiary hearing.
 
 
 20
 The district court based this order upon its finding that it had jurisdiction over the parties pursuant to 28 U.S.C. § 1331(a) and § 1361 (1976 and Supp. IV, 1980) and the administrative appeal provisions of 5 U.S.C. § 701 and § 705 (1976). The court also held that a pre-termination hearing was required under the provisions of the Omnibus Reconciliation Act of 1980, P.L. 96-499, § 916(b) (2) amending § 1910 of the Social Security Act, 42 U.S.C. § 1396i(a)(1) (Supp. IV 1980). The court further found that no emergency existed in any area that would require the immediate termination of participation in the Medicare-Medicaid programs and that the failure to accord the plaintiff a pre-termination hearing was a violation of Turtle Creek's right to due process under the law.
 
 
 21
 4. CARE INNS, INC.
 
 
 22
 On May 11 through 14, 1981 an onsite survey was conducted at the Clarksville Healthcare Center, a Medicare skilled nursing facility owned by Care Inns, Inc. Based upon the results of this survey demonstrating that the facility failed to comply with Medicare conditions of participation and based upon a prior plan of corrections submitted by Care Inns on June 5, 1981, in response to the notice of deficiencies in the facility received at the time of the survey, the U. S. Department of Health and Human Services refused to renew Care Inns' Medicare provider agreement that was scheduled to terminate on September 1, 1981.[12] The Department notified Care Inns of this decision by letter dated July 22, 1981 in which the Department further informed Care Inns that the results of the survey showed that the facility had deficiencies which seriously limited the facility's capability to render adequate care and "immediately jeopardized the health and safety of the patients." Attached to the letter was a six-page statement listing the deficiencies found during the survey. The letter also informed Care Inns of its right to request reconsideration of the nonrenewal decision and of the possibility that Department officials would meet with representatives of the facility to discuss the survey findings prior to the nonrenewal deadline.
 
 
 23
 Care Inns requested a resurvey and responded to the cited deficiencies contending that the facility was now in compliance with all Medicare conditions of participation. Pursuant to Care Inns' request a resurvey of the facility was conducted on August 10 and 11, 1981. The resurvey demonstrated that in several respects the facility continued to fail to provide the proper and required nursing care to its patients. In addition to the resurvey a meeting was held between Care Inns' representatives and officials of the U. S. Department of Health and Human Services in which Care Inns was afforded an opportunity to respond to the resurvey findings and submit new evidence of compliance.
 
 
 24
 At the time the plaintiff requested a resurvey it also requested a pre-termination evidentiary hearing which request was denied by the defendant.
 
 
 25
 On August 31, 1981 Care Inns filed this action in the district court making substantially the same allegations as contained in the Americana and Turtle Creek complaints. By agreement of the parties a bench trial on the merits was consolidated with the preliminary injunction hearing. The district court, in its findings of fact and conclusions of law held that, in fact, "no emergency" existed at the time of the survey justifying the Department's refusal to afford a pre-termination hearing. The court further held that the Department's decision not to renew the provider agreement was an appealable final order of an administrative agency under 5 U.S.C. § 701 and § 705. The court held that its subject matter jurisdiction over the case existed under 28 U.S.C. § 1331(a) (federal question jurisdiction) and in fact the failure of the defendants to afford a pre-termination hearing violated the provisions of the federal Omnibus Reconciliation Act of 1980 § 916(a).
 
 
 26
 In the alternative, the court concluded that both the federal and state defendants failed to provide the plaintiff with a hearing in violation 42 U.S.C. § 405(g) and/or the Indiana Administrative Adjudication Act. Based upon these holdings the court granted the requested injunction and prohibited the defendants from enforcing the nonrenewal sanction for the year September 1, 1981 through August 31, 1982.
 
 5. R. N. NURSING HOME
 
 27
 The Indiana Department of Public Welfare notified the R. N. Nursing Home (R. N.) by letter dated December 4, 1979 that it was going to be decertified as a Medicaid intermediate care facility because it failed to comply with the conditions of participation in that program. The Indiana Department's action was based upon the results of a survey conducted at the home which revealed numerous deficiencies in the facility. The letter sent by the Indiana Department of Public Welfare notified the facility that it had 15 days to file written objections to the decision and to request an administrative redetermination.
 
 
 28
 Subsequently, R. N. Nursing Home requested the Indiana Department of Public Welfare to hold a hearing prior to any decertification action. Upon agreement of the parties this hearing was postponed pending the outcome of a state licensure proceeding involving R. N.'s state nursing home license. The licensure proceedings were completed on August 18, 1980 with a recommendation that the home be accorded a full license.
 
 
 29
 On September 23, 1980 the Regional Medicaid Director of the Federal Health Care Financing Administration notified the Indiana Department of Public Welfare by a letter that the state's claim for federal matching funds for Medicaid payments made to R. N. Nursing Home was being recommended for deferral because of the determination that R. N. was not in compliance with the Medicaid intermediate care facility conditions of participation.[13]
 
 
 30
 Under Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. (1976 and Supp. IV, 1980) the Medicaid program is established as a cooperative federal-state program to provide payments for "necessary medical services" rendered to needy individuals. A state is not required to institute a Medicaid program; however, if it chooses to do so it must submit a satisfactory state plan to the U. S. Department of Health and Human Services. The U. S. Department then reviews the plan and if a state plan is approved the state becomes entitled to federal grants reimbursing the state for a portion of the expenditures which it makes to qualified healthcare facilities for providing medicaid services to qualified individuals.
 
 
 31
 Under 42 U.S.C. § 1396a(a)(33)(B) (1976) the states are responsible for determining whether or not a state facility complies with the federal requirements of participation as a Medicaid intermediate care facility.[14] Once the facility has been so certified the state Medicaid agency (here the Indiana Department of Public Welfare) may execute a provider agreement with the facility for the provision of services and making of payments under the state plan. The state may not obtain federal reimbursement of expenditures made for services rendered in a facility which has not been certified as meeting federal requirements of participation and which lacks a valid provider agreement.
 
 
 32
 Under Medicaid the U. S. Department of Health and Human Services does not pay nursing homes directly for the federal government's share of services they have rendered to eligible Medicaid recipients. Rather, the Medicaid payment procedure, set out in 42 U.S.C. § 1396b(d) (1976 and Supp. IV, 1980) requires the Secretary of the U. S. Department of Health and Human Services to estimate the amount due the state for the payments it has made to Medicaid providers based upon the state's report of its expenditures and "such other investigation as the Secretary may find necessary" and adjusted to reflect, inter alia, any prior overpayment or underpayment "which the Secretary determines was made for any prior quarter." 42 U.S.C. § 1396b(d)(1), (2). Based on these factors the Secretary then issues a grant award to the state.
 
 
 33
 A determination by the Secretary that expenditures claimed by the state do not meet federal requirements and, hence, are not reimbursable with federal funds is called a "disallowance." See 42 U.S.C. § 1316(d); 45 C.F.R. § 201.14(a), (d), as amended (1981).
 
 
 34
 42 U.S.C. § 1316(d) (1976) provides for an administrative reconsideration of the disallowance of Title XIX funds to a state:
 
 
 35
 Whenever the Secretary determines that any item or class of items on account of which Federal financial participation is claimed under ... (Title XIX) shall be disallowed for such participation, the state shall be entitled to and upon request shall receive a reconsideration of the disallowance.
 
 
 36
 42 U.S.C. § 1316(d).
 
 
 37
 Even before a disallowance the Department may defer a decision on the allowability of claims submitted by a state until further evidence is submitted. 45 C.F.R. § 201.15 et seq. (1981). The regulations allow the administrator or designate of the Health Care Financing Administration of the U. S. Department of Health & Human Services to defer claims only when the administrator "believes the claim or specific portion is of questionable allowability." 45 C.F.R. § 201.15(c)(1). After a deferral action is taken, the state is given an opportunity to provide documentation concerning the proposed disallowance of the claim. 45 C.F.R. § 201.15(c)(2). After all documentation has been received, the Administrator has 90 days to determine the propriety of allowing of the claim. 45 C.F.R. § 201.15(c)(6). If the U. S. Department disallows the claim the state is given a written notification of the disallowance decision, 45 C.F.R. § 201.15(c)(8), and is permitted another administrative appeal pursuant to 45 C.F.R. § 201.14. 45 C.F.R. § 201.15(c) (9).
 
 
 38
 Thus in this case the Federal Healthcare Financing Administration deferred payment of Federal Matching Funds to the Indiana Department of Public Welfare because of the pending decertification action brought by the Indiana Department.
 
 
 39
 Subsequently, the Indiana Department of Public Welfare, by a letter dated December 19, 1980, notified R. N. that based upon the Department's interpretation of the relevant Indiana law (Indiana Code 12-1-7-14.9(b)) it was required to defer any payment to the nursing home because federal financial participation was no longer approved and available to the facility. According to the plaintiffs this action was taken without a proper hearing on the question of the termination decision.
 
 
 40
 The plaintiffs then brought this action seeking a temporary restraining order prohibiting the defendants from discontinuing the reimbursement of R. N. for Medicaid intermediate care services. The plaintiffs alleged that they were entitled to a pre-termination hearing pursuant to 5 U.S.C. § 701 et seq., § 916(b)(2) of the Omnibus Reconciliation Act of 1980, P.L. 96-499 and this court's decision in Hathaway v. Mathews, 546 F.2d 227 (7th Cir. 1976). On December 31, 1980, the district court temporarily restrained the defendants from terminating reimbursement for services rendered by R. N. and the parties subsequently agreed to continue the temporary restraining order pending a hearing. The district court on January 27, 1981 ordered that the December temporary restraining order remain in full force and effect pending further order but permitted new administrative proceedings if any new basis for decertification was found.
 
 
 41
 On March 9, 1981, the Indiana Department of Public Welfare petitioned the district court to amend its temporary restraining order to permit the removal of patients from the home pursuant to a subsequent decertification action. The court denied this petition on March 19, 1981, holding that the subsequent decertification action was interrelated to the pending action and therefore was more in the nature of a "continued" decertification action than a new action and thus came within the parameters of the prohibitions recited in the temporary restraining order.
 
 ISSUES
 
 42
 (1) Did the district courts have subject matter jurisdiction of each of the consolidated cases?
 
 
 43
 (2) Did the district courts properly exercise pendent jurisdiction over the state claims in the Care Inns case?
 
 SUBJECT MATTER JURISDICTION
 A. FEDERAL QUESTION JURISDICTION
 
 44
 In each of the consolidated cases the defendants challenged the courts' subject matter jurisdiction over the action. The district courts in each instance rejected this argument holding that subject matter jurisdiction existed based upon either Federal Question jurisdiction, 28 U.S.C. § 1331, Social Security Act Appeal jurisdiction, 42 U.S.C. § 405(g), Federal Mandamus jurisdiction, 28 U.S.C. § 1361, or Administrative Appeals jurisdiction, 5 U.S.C. § 701 et seq.[15]
 
 
 45
 We must begin our analysis by pointing out that the holdings of the district courts in each of these cases predated the decision of this court in Northlake Community Hospital v. United States of America, 654 F.2d 1234 (7th Cir. 1981) in which the question of the district court's subject matter jurisdiction over actions challenging the termination of Medicare and/or Medicaid provider agreements was specifically addressed and the district courts were thus without the benefit of that opinion.
 
 
 46
 Northlake was an appeal from a dismissal of a suit for injunctive relief brought by the Northlake Hospital seeking to prohibit the U. S. Department of Health and Human Services from terminating the hospital's Medicare provider agreement without first affording it a pre-termination administrative hearing. This court began its analysis of the district court's dismissal of the lawsuit for lack of subject matter jurisdiction by recognizing that consistent with the United States Supreme Court's decision in Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), 42 U.S.C. § 405(h) precludes the use of 28 U.S.C. § 1331 as a jurisdictional basis for challenging Medicare provider termination decisions.
 
 
 47
 In Trinity Memorial Hospital of Cudahy, Inc. v. Associated Hospital Services, 570 F.2d 660 (7th Cir. 1977), this court agreed that Salfi 'precludes the use of 28 U.S.C. § 1331 as a jurisdiction basis' for Medicare provider reimbursement disputes. Although Northlake's claim in the instant case involves the procedures for terminating a provider agreement rather than the procedures for obtaining reimbursement pursuant to such an agreement, the result with respect to these two procedures should be the same. Under Salfi and Trinity, Northlake's allegation of federal question jurisdiction is defective.
 
 
 48
 Northlake, 654 F.2d at 1240.
 
 
 49
 This holding is applicable to the cases at bar and precludes the district court from establishing subject matter jurisdiction over the cases based upon federal question jurisdiction.
 
 B. JURISDICTION UNDER 42 U.S.C. § 405(g)
 
 50
 The court continued its analysis in Northlake and considered whether subject matter jurisdiction was conferred upon the district courts by 42 U.S.C. § 405(g). It was recognized that Title XVIII of the Social Security Act specifically states that an institution dissatisfied with a final decision of the Secretary of the Department of Health and Human Services to terminate its Medicare provider agreement may obtain judicial review of the decision pursuant to 42 U.S.C. § 405(g). 42 U.S.C. § 1395ff(c). However, the court noted that § 405(g) permits review only where the three requirements set forth therein have been complied with:
 
 
 51
 Under the terms of Section 405(g), review is available only if three requirements have been satisfied: (1) an action was brought 'after any final decision of the Secretary made after a hearing to which (the provider) was a party;' (2) the action was commenced within 60 days after the mailing of the notice of decision by the Secretary or within such time as the Secretary may allow; and (3) the action was filed in an appropriate court. 42 U.S.C. § 405(g) (1979).
 
 
 52
 Northlake, 654 F.2d at 1240.
 
 
 53
 This court then pointed out that the Supreme Court in its Salfi opinion held that the first requirement of § 405(g) jurisdiction is a final decision by the Secretary after a hearing and this first requirement is "central to the requisite grant of subject-matter jurisdiction" Salfi, 422 U.S. at 764, 95 S.Ct. at 2466. In the cases consolidated in this appeal, as well as in Northlake, the plaintiff Medicare-Medicaid providers did not exhaust their available administrative remedies prior to the filing of these lawsuits and thus have not received the "final decision" of the Secretary required for 42 U.S.C. § 405(g) jurisdiction.
 
 
 54
 The plaintiffs in the case at bar argue, however, as did Northlake Hospital, that they fall within an exception to the final decision requirement.
 
 
 55
 In Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) the Supreme Court found that there are two prerequisites to a final decision under § 405(g). The first of these prerequisites is the presentation of a claim for benefits. This element is nonwaivable and absent such a claim there can be no appealable decision of any type. Id. at 329, 96 S.Ct. at 900. In each of the cases at bar the parties challenge the decision to terminate their provider status along with challenging the administrative body's failure to allow them a pre-termination hearing and thus they have satisfied this first element.
 
 
 56
 The second prerequisite to a "final decision" under § 405(g) set forth in Mathews, 424 U.S. at 329, 96 S.Ct. at 900, requires the exhaustion of administrative remedies and this element is waivable by the Department of Health and Human Services. Id. at 328, 96 S.Ct. at 899. In addition to being waivable by the Department the decision of the United States Supreme Court in Mathews establishes that this exhaustion requirement may also be waived where the plaintiff raises a colorable constitutional challenge which is entirely collateral to his claim of entitlement and the claimant's interest in having this issue resolved is so great as to make deference to the agency's judgment inappropriate. See Mathews, 424 U.S. at 331, 332, 96 S.Ct. at 900-01; Northlake, 654 F.2d at 1243.
 
 
 57
 In the instant cases as in Northlake the plaintiffs argue that the alleged due process violation arising out of the failure to afford a pre-termination hearing constitutes a colorable constitutional claim sufficient to permit a waiver of the exhaustion prerequisite of § 405(g). Similar arguments regarding constitutional entitlement to a pre-termination hearing under the due process clause were specifically rejected by this court in Northlake, 654 F.2d at 1241-1243 and the rationale of that opinion rejecting the constitutional due process claim is equally applicable to the cases consolidated in this appeal.
 
 
 58
 Each of the plaintiffs in the cases consolidated herein was afforded advance notice of the decision to decertify their respective facility as a Medicare and/or Medicaid provider. In addition, each was informed of the deficiencies upon which the decision to decertify the facility was based and was afforded an opportunity for a resurvey to demonstrate any corrections made in the listed deficiencies and each was permitted to submit documentation explaining or refuting the existence of the deficiencies. In the case of Care Inns, Inc. the facility was also permitted to meet with personnel of the Department of Health and Human Services and submit evidence of compliance with applicable conditions of participation prior to termination. Weighing the benefits of these procedural protections, the interest in efficient and not unduly expensive administrative procedures as well as the strong government interest in the protection of Medicare and Medicaid recipients against the risk that a facility will be erroneously terminated as a Medicare or Medicaid provider, we conclude that the plaintiffs have failed to establish a colorable claim of constitutional entitlement to a pre-termination hearing.
 
 
 59
 The plaintiffs have argued that the prior decision of this court in Hathaway v. Mathews, 546 F.2d 227 (7th Cir. 1976) supports the contrary conclusion that the plaintiffs are constitutionally entitled to a pre-termination hearing.[16] The Hathaway decision predated the later Northlake decision and was factually distinguished in a footnote therein. 654 F.2d at 1243 n.10. In Hathaway the Medicaid facility was terminated from the Medicaid program by the U. S. Department of Health and Human Services acting independent of the state Medicaid agency and it did not receive notice of the alleged deficiencies, nor was a post-termination hearing available to it under the applicable regulations. This is contrasted with the fact situations presented here, wherein each of the plaintiffs received written notice of the alleged deficiencies and had post-termination procedural protections available to them. To the extent that Hathaway remains good law within the circuit it is limited to its unique factual situation, including a lack of prior notice of deficiencies from the terminating agency and the absence of post-termination appeal procedures.
 
 
 60
 Laura Hathaway, plaintiff in case No. 81-1507 consolidated in this appeal, specifically argues that the facts of her case more nearly resemble those of the earlier Hathaway decision than those of Northlake. The Hathaway case consolidated in this appeal differs from the earlier Hathaway decision, however, because in the case at bar the facility was decertified initially by the state Medicaid agency acting on its own rather than on behalf of the U. S. Department of Health and Human Services and it had procedures available to it through which it could challenge the state's determination. In addition, the federal Department of Health and Human Services merely deferred reimbursement to the state for services rendered by R. N. Nursing Home pending resolution of the decertification question. The fact that the state Medicaid agency failed to challenge the deferral of repayment does not provide the home with a colorable constitutional claim upon which it could assert jurisdiction in a federal court.
 
 
 61
 In light of our holding that the plaintiffs have not presented a colorable constitutional claim to a due process pre-termination hearing, we conclude that the district courts in the present action did not have subject matter jurisdiction over the consolidated cases pursuant to 42 U.S.C. § 405(g).
 
 C. MANDAMUS JURISDICTION
 
 62
 In the alternative, the plaintiffs have asserted that the district courts had mandamus jurisdiction over the cases consolidated in this appeal pursuant to the provisions of 28 U.S.C. § 1361. Plaintiffs contend that § 916 of the Omnibus Reconciliation Act of 1980, P.L. 96-499 creates a clear right to a pre-termination hearing and thus the exercise of mandamus jurisdiction on the part of the district courts was proper.
 
 
 63
 The defendants respond to these arguments by contending that 42 U.S.C. § 405(h)[17] is intended to preclude the exercise of mandamus jurisdiction in the same manner as it precludes the exercise of federal question jurisdiction over decisions appealable under the provisions of the Social Security Act. They argue that consistent with principles of statutory construction § 405(h) should be read as encompassing the statutory addition of mandamus jurisdiction within the jurisdictional exclusions of § 405(h).
 
 
 64
 The defendants further argue that § 916 of the Omnibus Reconciliation Act does not create a clear right to a pre-termination hearing under the facts of these cases even if the district courts are entitled to exercise mandamus jurisdiction over the decisions made under the Social Security Act and thus the exercise of mandamus jurisdiction in these consolidated cases was inappropriate.
 
 
 65
 Independent of the question of whether § 405(h) bars mandamus jurisdiction in cases brought under the provisions of the Social Security Act, it is well established in case law that mandamus jurisdiction may be invoked only where the following three elements are present:
 
 
 66
 Mandamus may properly issue only when three elements are present:
 
 
 67
 (1) a clear right in the plaintiff to the relief sought;
 
 
 68
 (2) a plainly defined and peremptory duty on the part of the defendant to do the act in question;
 
 
 69
 (3) no other adequate remedy available.
 
 
 70
 Lovallo v. Froehlke, 468 F.2d 340, 343 (2nd Cir. 1972). Cervoni v. Secretary of Health, Education and Welfare, 581 F.2d 1010, 1019 (1st Cir. 1978).
 
 
 71
 Regarding the first of these elements it is also established that the mandamus remedy is only available "under exceptional circumstances of clear illegality." Id. at 1019.
 
 
 72
 When the performance of official duty calls for a construction of governing law, the (federal) officer's interpretation will not be disturbed by a writ of mandamus unless it is clearly wrong and his official action is arbitrary and capricious.
 
 
 73
 Association of American Medical Colleges v. Califano, 569 F.2d 101, 110 n.80 (D.C.Cir.1980).
 
 
 74
 The plaintiffs in the cases consolidated in this appeal assert that recent changes made in the Social Security Act by § 916 of the Omnibus Reconciliation Act of 1980, P.L. 96-499 established their clear right to a pre-termination hearing. Specifically the plaintiffs contend that subpart (a) of § 916 is applicable to the case at bar. That section provides:
 
 
 75
 ALTERNATIVE TO DECERTIFICATION OF LONG-TERM CARE FACILITIES OUT OF COMPLIANCE WITH CONDITIONS OF PARTICIPATION; LOOK BEHIND AUTHORITY
 
 
 76
 SEC. 916. (a) Section 1866 of the Social Security Act is amended by adding at the end thereof the following new subsection:
 
 
 77
 "(f)(1) Where the Secretary determines that a skilled nursing facility which has filed an agreement pursuant to subsection (a)(1) or which has been certified for participation in a plan approved under title XIX no longer substantially meets the provisions of section 1861(j), and further determines that the facility's deficiencies"(A) immediately jeopardize the health and safety of its patients, the Secretary shall provide for the termination of the agreement or of the certification of the facility and shall provide, or
 
 
 78
 "(B) do not immediately jeopardize the health and safety of its patients, the Secretary may, in lieu of terminating the agreement or certification of the facility, provide
 
 
 79
 that no payment shall be made under this title (and order a State agency established or designated pursuant to section 1902(a)(5) of this Act to administer or supervise the administration of the State plan under title XIX of this Act to deny payment under such title XIX) with respect to any individual admitted to such facility after a date specified by him.
 
 
 80
 "(2) The Secretary shall not make such a decision with respect to a facility until such facility has had a reasonable opportunity, following the initial determination that it no longer substantially meets the provisions of section 1861(j), to correct its deficiencies, and, following this period, has been given reasonable notice and opportunity for a hearing.
 
 
 81
 The plaintiffs argue that subpart 2 of the new subsection requires a hearing prior to the date of any termination or decertification of a Medicare skilled nursing facility.
 
 
 82
 The plaintiffs' interpretation of subpart 2 is based upon their conclusion that the phrase "such a decision" refers to the Secretary's determination of whether the facility's deficiencies "immediately jeopardize the health and safety" of the patients. This construction of subpart 2 is essential to the plaintiffs' interpretation of the statutory provision because a construction of the phrase "such a decision" as applying solely to the Secretary's decision in subpart (1)(B) of whether to impose an alternative sanction would require a pre-termination hearing only in those situations where the Secretary determines that the facility's deficiencies do not "immediately jeopardize" the health and safety of the patients. In each of the cases consolidated in this appeal in which the Secretary determines that a facility did not substantially meet the Medicare conditions of participation the Secretary concluded that a situation of "immediate jeopardy" existed.[18]
 
 
 83
 To construe the phrase "such a decision" in the manner in which the plaintiff asserts is appropriate leads one to the anomalous situation of permitting a skilled nursing facility to continue treating patients under conditions which the Secretary has concluded place the patients' very health and safety in "immediate jeopardy" while the facilities are afforded a time consuming pre-termination hearing. It is ludicrous to believe that the legislature intended to permit the appeal procedures to act as a roadblock to the prompt removal of patients for their own protection and safety from substandard facilities.
 
 
 84
 The plaintiffs argue that the need for haste in terminating a skilled nursing facility is not a purpose of the new provision because considerable delay occurs under the present procedure during the resurvey and notice period. The existence of this time-lag does not justify further delay in termination or nonrenewal but merely supports our earlier conclusion that the current procedures already afford the plaintiffs more than adequate due process.
 
 
 85
 The plaintiffs' construction of the phrase "such a decision" is also inconsistent with the use of the mandatory term "shall" in subsection (1)(A) of the provision. The use of the mandatory term "shall" requires the termination sanction in cases where the conditions of "immediate jeopardy" to health and safety are found to exist.
 
 
 86
 Thus we conclude that a common sense reading of the statutory provision leads to the conclusion that a pre-termination hearing is not required where the Secretary determines that a situation of "immediate jeopardy" exists.
 
 
 87
 The limited legislative history available concerning the code provisions added by § 916 of the Omnibus Reconciliation Act supports our interpretation of the legislation. The House Report on Public Law 96-499 explains that the purpose of the new Code provisions was to provide an alternative sanction to termination in cases where "immediate jeopardy" to patients' health and safety did not exist:
 
 
 88
 At present, the only sanction available in many jurisdictions to penalize a skilled nursing facility which is out of compliance with the conditions of participation in the Medicare and Medical (sic) programs is to terminate that facility's participation in the program. Frequently, this sanction involves an overriding hardship to program beneficiaries which makes its use desirable (sic), if not impossible
 
 
 89
 In the case of facilities that are substantially out of compliance but do not have deficiencies that immediately jeopardize the health and safety of their patients, the section gives the Secretary authority to impose an intermediate sanction, short of the more drastic step of program termination.
 
 
 90
 Under the provision, a facility would have an opportunity to develop and implement a plan for correcting its deficiencies, in accordance with existing Medicare policies on the correction of provider deficiencies. Following the facility's failure to satisfactorily meet this requirement, the Secretary could apply intermediate sanctions, but only after the Secretary has provided the facility with an opportunity to present its case at an informal hearing consistent with current practices. If the facility seeks further administrative or judicial appeals, the sanction would remain in effect while the appeals were pending.
 
 
 91
 House Report No. 96-1167, reported in (1980), U.S.Code Cong. & Ad.News, 96th Congress 2d Sess. 5526, 5569.
 
 
 92
 Later in that same report, however, it is made clear that the prompt termination sanction was intended to remain applicable in cases of "immediate jeopardy."
 
 
 93
 (T)he committee believes that this sanction should not be used as an alternative in situations where a noncomplying facility's deficiencies place the health and safety of its patients in immediate jeopardy; instead, the response for the Secretary in such cases must be to deny all reimbursement of additional patients and to make appropriate arrangements for the orderly, planned transfer of existing patients.
 
 
 94
 Id. at 5570.
 
 
 95
 The legislative history and plain language of § 916(a) of the Omnibus Reconciliation Act mandate the conclusion that the Code provision does not create a clear right on the part of the plaintiffs to a pre-termination hearing in situations where the Secretary determines that the facility's deficiencies placed the patients' health and safety in "immediate jeopardy."
 
 
 96
 The plaintiffs argue that several of the district courts found that, in fact, no situation of "immediate jeopardy" or emergency existed. This factual conclusion is more appropriately deferred to the expertise of the licensing agency and it is not a proper consideration for a court under mandamus jurisdiction where a clear right to a pre-termination hearing is required and a federal officer's interpretation "will not be disturbed unless it is clearly wrong." Association of American Medical Colleges v. Califano, 569 F.2d at 110 n.80.
 
 
 97
 Deference to the expertise of professionals who are trained and experienced in evaluating the compliance of Medicare or Medicaid facilities with federal regulations is consistent with recent decisions of the United States Supreme Court cautioning against a substitution of a judge's opinion for that of a professional. Most recently in Youngberg v. Romeo, --- U.S. ----, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) the Court made the following comments regarding deference to a professional's opinion as to appropriate patient care:
 
 
 98
 In determining what is "reasonable"-in this and in any case presenting a claim for training by a state-we emphasize that courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized. Moreover, there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions. See Parham v. J. R., 442 U.S. 584, 607 (99 S.Ct. 2493, 2506-2507, 61 L.Ed.2d 101) (1979); Bell v. Wolfish, supra, 441 U.S. (520) at 544 (99 S.Ct. 1861 at 1877, 60 L.Ed.2d 447) (Courts should not " 'second-guess the expert administrators on matters on which they are better informed.' ").
 
 
 99
 --- U.S. at ----, 102 S.Ct. at 2460.
 
 
 100
 Absent a clear right to a pre-termination hearing, mandamus jurisdiction is not appropriate in the consolidated cases in this appeal and thus we hold that the district courts were without jurisdiction over these cases.[19]
 
 
 101
 Because we determine that no clear right existed entitling the plaintiffs to a pre-termination hearing, it is not necessary to determine whether 42 U.S.C. § 405(h) precludes mandamus jurisdiction as well as federal question jurisdiction in these cases.
 
 PENDENT JURISDICTION
 
 102
 The sole issue remaining for our consideration is whether the district court in the Care Inns case properly exercised pendent jurisdiction when it determined that the Indiana Administrative Adjudication Act requires a hearing prior to the Indiana Department of Public Welfare's termination of a provider of skilled and intermediate nursing services from participating in the Medicaid program. It is axiomatic that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." United Mineworkers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Further it is established that a federal court may exercise pendent jurisdiction only where there exists a federal claim of "substance sufficient to confer subject matter jurisdiction on the court." Id. at 725, 86 S.Ct. at 1138.
 
 
 103
 In light of our holding that the district courts were without subject matter jurisdiction over the cases consolidated in this appeal, it is equally clear that the district court could not exercise pendent jurisdiction over the state claim concerning entitlement to a pre-termination hearing under the relevant Indiana Code provisions. Thus the orders of the district court entered in these consolidated cases are REVERSED.
 
 
 
 *
 This opinion is being released first in typewritten form on August 18, 1982 because the order in Continental Manors, Inc. v. Schweiker, No. 82-1065 refers thereto
 
 
 **
 The Honorable George Templar, Senior District Judge for the United States District Court for the District of Kansas, is sitting by designation
 
 
 [1]
 Judge Cale J. Holder entered the orders appealed from in Appeals Nos. 81-2482, 81-2755, and 81-2783. Judge S. Hugh Dillin entered the order appealed from in Appeal No. 81-1522 and Judge James E. Noland entered the order appealed from in Appeal No. 81-1507
 
 
 [2]
 There are 18 "conditions" that nursing homes are required to meet. Each condition relates to one broad aspect of the facilities' operations such as "medical direction" or "nursing services." Each condition of participation is divided into subparts known as "standards." Examples of standards include "coordination of medical care" or "rehabilitative nursing care." Standards are further broken down into elements, which are regulatory requirements such as "presence of marked spaces for parking by the handicapped," or the establishment of procedures for recording deviations in the patient's food or fluid intake. A deficiency is a failure to comply with some "element" of a standard. When several elements are deficient a "standard" is not met and if enough standards are not met a finding is made that a facility does not meet a given "condition of participation."
 
 
 [3]
 Pursuant to 42 U.S.C. § 1395aa (1976 and Supp. IV, 1980) the Secretary of the U. S. Department of Health and Human Services is authorized to appoint a State health agency or other appropriate State agency (or local agencies) to conduct surveys of the skilled nursing facilities and inspect the physical plant and operational activities of the facility. In these consolidated cases the Indiana State Board of Health conducted the surveys made on behalf of the U. S. Department of Health and Human Services
 
 
 [4]
 Attached to the Department's October 22, 1980 letter was a four page summary of the deficiencies found in the Americana-Elkhart facility
 Among the items listed in the Statement of Deficiencies was the finding that the facility did not meet the Nursing Services Condition of Participation due to deficiencies such as the lack of sufficient nurse staff coverage, and the lack of documentation that physician and medication orders were being followed. The statement of deficiencies also listed other deficiencies including but not limited to the finding that medications in the drug cart used in passing medications were not patient identified, therapeutic menus were not planned in writing, and patient medical records lacked physicians' progress notes at the time of their visits.
 
 
 [5]
 A reconsideration is authorized by 42 CFR § 405.1510-1519 (1981). During a reconsideration the Secretary or his appropriate agent reviews the findings on which the original decision was based and any new evidence submitted by the facility within a reasonable time and either affirms or revises the initial decision
 
 
 [6]
 42 CFR § 442.20(b) (1981) provides:
 § 442.20 Additional requirements for agreements with SNF's participating in Medicare.
 (b) If the Secretary notifies the Medicaid agency that he has denied, terminated, or refused to renew a Medicare agreement with a SNF, the agency must deny, terminate, or refuse to renew its Medicaid agreement with that SNF. The denial, termination, or refusal to renew the Medicaid agreement must be effective on the same date as the denial, termination, or refusal to renew the Medicare agreement.
 
 
 [7]
 Americana Health Care Corporation owns both the Americana-Elkhart facility and the Americana-Midtown facility. Because of this identity of ownership the Americana Health Care Corporation brought its challenge to the pre-termination procedures applied by the U. S. Department of Health and Human Services in both the Americana-Midtown and Americana-Elkhart cases in a single action
 
 
 [8]
 Among the listed deficiencies were the following: insufficient nurse staff coverage, rehabilitative nursing care services not performed daily, treatments being performed either without physicians' orders or not according to such orders, lack of a clean interior, ineffective aseptic procedures, and food not stored, prepared or served under sanitary conditions
 
 
 [9]
 See footnote 7 regarding the common ownership of the two facilities
 
 
 [10]
 During the preparation of this opinion the court received notice that both Americana-Midtown and Americana-Elkhart have been recertified for Medicare participation effective April 27, 1982 and April 29, 1982 respectively. Upon receipt of this notice the court requested that the parties submit a statement on whether the issues on appeal are moot in view of the recertification. After consideration of the statements of the parties, including the plaintiffs' response to the government's statement, submitted pursuant to our request we determine that the issues raised by the appeal in # 81-1522 Americana Healthcare Corp. v. Schweiker are not moot because resolution of the issues presented herein is necessary to a proper determination of the question of whether the nursing facility was validly decertified during the period extending from the date of the initial decertification until the date of effective reinstatement. In its statement to the court on the question of mootness the U. S. Department of Health and Human Services raised for the first time the question of its right to recover payments made to the Americana Healthcare facilities during the pendency of this appeal. Because neither party has argued or briefed the issue of the government's right to recover the Medicare payments, we decline to reach this issue on appeal. Further, the resolution of the issues presented herein serves the public interest by resolving an issue which otherwise is likely to recur, that is the question of entitlement to pre-termination hearings and the limitations on district court review of decertification decisions prior to an agency's "final decision."
 
 
 [11]
 Among the deficiencies listed by the Indiana State Board of Health were the following: nursing services not being provided to patients in need of such services, no active rehabilitation program in feeding, bladder training, ambulation and self-care services, patient records lacked pertinent information regarding patient condition, assessment, and treatment, and presence of unsanitary conditions relating to dietetic services
 
 
 [12]
 The statement of deficiency listed, among other items, the following: instances when proper nursing care was not being provided to patients in need of such care, treatment and medication being administered contrary to physicians' orders, supervision of nursing services inadequate, failure to notify physician in case of patient with recent leg amputation having pain, presence of unsanitary conditions relating to dietetic services, required medications frequently unavailable, and no written procedures for preventing spread of infection from linens and dressings
 
 
 [13]
 The deficiencies found during the survey are not recited in the record on appeal
 
 
 [14]
 An intermediate care facility is one kind of medical service which a state may provide under its Title XIX plan. Other types of services such as those provided by a skilled nursing facility can be provided under Medicaid
 
 
 [15]
 In this appeal the plaintiffs no longer continue to assert that subject matter jurisdiction exists under the provisions of 5 U.S.C. § 701 et seq. The decision of the United States Supreme Court in Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1976) establishes that in fact no such subject matter jurisdiction exists under the Administrative Procedure Act. Id. at 107, 97 S.Ct. at 985
 
 
 [16]
 Initially it can be pointed out that the Hathaway decision did not address the question of jurisdiction which is the basis of both the Northlake and the present opinion
 
 
 [17]
 42 U.S.C. § 405(h) provides:
 Finality of Secretary's decision. The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.
 
 
 [18]
 In the cases of Americana-Elkhart, Americana-Midtown, and Turtle Creek the Secretary's letter to the facility used the phrase "seriously limit your (their) capability to render adequate care and insure the health and safety of your (their) patients" when informing the facility that it did not substantially meet the Medicare conditions of participation. This phrase is interpreted as being equivalent to a finding of "immediate jeopardy." The brief of all the plaintiffs to this appeal concedes as much in Footnote 10 of their brief in which they argue that the Secretary's determination of "immediate jeopardy" is not substantiated by the record
 
 
 [19]
 The arguments of plaintiff Laura Hathaway to the effect that she is entitled a pre-termination hearing under the "look behind" provisions of § 916(b)(2) of the Omnibus Reconciliation Act are also rejected because the decision to decertify was initially made by the state Medicaid agency and the argument that the decertification action was subsequently abandoned is belied by the state's continuing efforts to decertify the facility. See the State's Emergency Petition to Amend the Court's Entry of January 27, 1981 dated March 9, 1981